IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Twila Anderson,                    :

          Plaintiff,               :

     v.                            :Case No.  2:14-cv-1840

                                   :CHIEF JUDGE EDMUND A. SARGUS, JR.
Commissioner of Social              Magistrate Judge Kemp
Security,                          :

          Defendant.               :

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Twila Anderson, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for supplemental security income.  That application was filed on December 26, 2011, and alleged that Plaintiff became disabled on January 1, 2008.

After initial administrative denials of her claim, Plaintiff was given a video hearing before an Administrative Law Judge on March 5, 2013.  In a decision dated April 16, 2013, the ALJ denied benefits.  That became the Commissioner's final decision on August 11, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on December 22, 2014.  Plaintiff filed her statement of specific errors on February 25, 2015, to which the Commissioner responded on April 17, 2015.  No reply brief was filed, and the case is now ready to decide.

II.  The Lay Testimony at the Administrative Hearing

Plaintiff, who was 46 years old at the time of the administrative hearing and who is a high school graduate and has a paralegal certificate, testified as follows.  Her testimony

appears at pages 68-90 of the administrative record.

Plaintiff first testified that she last worked a few years prior to the hearing. She stopped working because she could not stand being around people. She then attempted to go back to school but quit after three weeks due to panic attacks and depression. She said she had worked as a paralegal for six months to a year, and had done factory work, collections work, telemarketing, restaurant work, and work as a cashier as well, but did not hold any of those jobs for more than three months.

The primary reason Plaintiff did not think she could work was her discomfort in being around people. She also experienced unpredictable panic attacks and day-long nausea. Plaintiff was also depressed, especially since the break-up of her marriage, and cried frequently. She also slept 18 or 19 hours per day. She could help her son with homework and go to parent-teacher conferences, but could go grocery shopping only with assistance from her mother.

During a typical day, Plaintiff watched television and did some microwave cooking. Her mother helped her do the dishes and she also had help with cleaning. She had no outside activities. She took medication but it did not help her symptoms. Plaintiff also described frequent nightmares and daily mood swings. Her memory and focus were poor.

At the time of the hearing, Plaintiff was waiting for approval for knee replacement surgery. She experienced shortness of breath even without exertion and had pain even from climbing one flight of steps. She could walk a quarter of a mile, stand for five minutes before getting dizzy, and sit for 15 or 20 minutes at a time. She could not lift a gallon of milk and had problems using her hands for more than 20 minutes without a rest period. Finally, she had migraine headaches on a daily basis. She also used inhalers and a breathing machine for asthma.

-2-

Plaintiff testified that she had gone to Florida for a month about a year before the hearing. She mostly stayed in her room and watched television although she did go to the beach a few times. Her boyfriend had driven her there.

### III.  The Medical Records

The medical records in this case are found beginning on page 409 of the administrative record. Because Plaintiff's sole assignment of error does not require the review of any of the medical records, the Court omits a summary of those documents.

### IV.  The Vocational Testimony

Catherine Bradford was the vocational expert in this case. Her testimony begins on page 91 of the administrative record.

Ms. Bradford first testified about Plaintiff's past work. The various jobs she held ranged from the medium to the sedentary exertional levels, and from unskilled to skilled.

Ms. Bradford was then asked some questions about a hypothetical person of Plaintiff's age, education, and work experience who could work at the light exertional level. The person could occasionally climb ramps and stairs and occasionally stoop, kneel, crouch, and crawl. The person could not climb ladders, ropes, and scaffolds and had to avoid concentrated exposure to extremes of temperature, humidity, and wetness, as well as fumes, odors, dust, gases, and poor ventilation. That person was also limited to the performance of simple, routine tasks in a relatively static environment with clear expectations, few changes, and no fast production pace. The person also could tolerate only occasional and superficial contact with others. According to Ms. Bradford, someone with those limitations could not perform any of Plaintiff's past jobs but could still work as an assembler, inspector, or grader sorter. If the person were limited to sedentary work and could push or pull with the right leg only occasionally, there would be other jobs available,

including general production worker, assembler, and inspector.

Ms. Bradford was then asked if someone who would be off task for 15 per cent of the time could work. She said no. The same would be true for someone who would miss more than one or two days per month and for a person who had to be retrained after completing a probationary period.

V.  The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 43-56 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff had not engaged in substantial gainful activity since her application date of December 26, 2011.

Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including chondromalacia of the right knee, aortic valve stenosis, asthma, adjustment disorder with mixed anxiety and depressed mood, and panic disorder without agoraphobia. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the sedentary exertional level but she could only push or pull occasionally with the right leg. She could occasionally climb ramps and stairs and occasionally stoop, kneel, crouch, and crawl, could not climb ladders, ropes, and scaffolds, and had to avoid concentrated exposure to extremes of temperature, humidity, and wetness, as well as fumes, odors, dust, gases, and poor ventilation. Additionally, Plaintiff was limited to the performance of simple, routine tasks in a relatively static environment with clear expectations, few

-4-

changes, and no fast production pace.  She also worked better with things than with people but could have occasional and superficial interaction with others.

The ALJ found that, with these restrictions, Plaintiff could not do her past relevant work.  However, she could do the three sedentary jobs identified by the vocational expert - general production worker, assembler, and inspector.  The ALJ further found that such jobs existed in significant numbers in the State and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI.  Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises a single issue.  She argues that the ALJ erred by not asking the vocational expert if her testimony conflicted with information provided in the Dictionary of Occupational Titles.  The Commissioner responds that any error in this regard is harmless.

Social Security Ruling (SSR) 00-4p says, among other things, that "before relying on [vocational] evidence to support a disability determination" the ALJ "must ... identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by a [vocational expert] and information in the Dictionary of Occupational Titles" and also must "[e]xplain in the determination or decision how any conflict that has been identified was resolved."  The Commissioner appears to concede that this Ruling was not literally followed in this case, and the record bears that out.  The ALJ did not ask the vocational expert if her testimony was consistent with the DOT (although he did find, in the administrative decision, that "the undersigned has determined that the vocational expert's testimony is not inconsistent with the information contained in the Dictionary of Occupational Titles").  (Tr. 56).  The vocational expert did provide, during the course of her testimony, DOT numbers for the

-5-

three sedentary jobs she identified.  (Tr. 95).

The question raised by the ALJ's failure to make the required inquiry is whether the error was harmless given the facts of this particular case.  As the court observed in Stull v. Astrue, 2011 WL 830633 , *8 (N.D. Ohio Jan. 18, 2011), "courts have held that where there is no conflict between the DOT and the VE's testimony, any error in failing to comply with the requirements of SSR 00-4p is harmless...."  This Court has endorsed that principle.  See Prince v. Astrue, 2011 WL 1124989, *9 (S.D. Ohio Jan. 11, 2011)("Where no actual conflict is identified ... courts have consistently held that an ALJ's failure to comply with SSR 00-4p's inquiry requirement is harmless error").  Consequently, the Court's task here is limited to determining whether an actual conflict exists between the DOT and Ms. Bradford's testimony.

Plaintiff argues that such a conflict exists for these reasons: (1) the job of general production worker, the first one identified by the vocational expert, does not exist under the DOT number provided (DOT 739.687-182); (2) the jobs under that number involve work performed on a conveyor belt, which is usually done at a fast pace; (3) the job of assembler also does not exist under the DOT number given (DOT 685.687-026); that job is a "topper" which involves work with a knitting machine and is also fast-paced; and (4) the inspector job does not exist in the DOT at all.

The fact that two of these three jobs do not appear to exist in the DOT is not fatal to the ALJ's decision.  In fact, that argument appears to be foreclosed by the Court of Appeals' decision in Lindsley v. Comm'r of Social Security, 560 F.3d 601 (6th Cir. 2010).  There, as here, the plaintiff argued that because a particular job identified by a vocational expert did not appear in the DOT (the job there was "production inspector"),

-6-

there was an unresolved conflict between the vocational testimony and the DOT. The court rejected that reasoning, instead noting that the plaintiff "failed ... to cite any authority establishing that a conflict between the DOT and a VE's testimony exists simply because an occupation described by the VE does not specifically appear in the DOT." Id. at 605. In fact, as the Court of Appeals also noted, "neither the Commissioner nor the VE has an obligation to employ the DOT." Monateri v. Comm'r of Social Security, 436 Fed.Appx. 434, 446 (6th Cir. Aug. 11, 2011). Since no conflict exists as to those jobs, and they would be numerous enough to constitute substantial gainful employment (800 in Ohio and 39,000 nationally), a strong argument can be made that any additional issues about the vocational expert's testimony are moot. See, e.g., Martin v. Comm'r of Social Security, 170 Fed.Appx. 369 (6th Cir. March 1, 2006)(recognizing the principle that if "sufficient positions existed in the national economy to constitute a significant number of jobs even if all of the disputed jobs were eliminated," any error occurring with respect to the vocational testimony was harmless).

However, as to the remainder of Plaintiff's argument, as the court commented in Carey v. Apfel, 230 F.3d 131, 145-46 (5th Cir 2000), there are cases in which the testimony of a vocational expert will directly conflict with the DOT on matters like exertional or skill level for particular jobs, and there are more indirect or tangential conflicts. This case clearly falls into the latter category. In order to find a conflict here, Plaintiff first posits that the vocational expert meant to equate the production worker jobs she identified with the job listed under the DOT number she gave. If that were true, that job - table worker, or spotter - is described as requiring the examination of "squares (tiles) of felt-based linoleum material passing along on conveyor and replac[ing] missing and substandard tiles." Is that

-7-

a fast-paced production job?  The DOT does not say so.  The inference Plaintiff draws - that it must be such a job due to the reference to a conveyor - is too weak to establish the kind of direct conflict which, absent any other information, would likely require a remand.  The same is true for the assembler job.  If the vocational expert really meant to describe the "topper" job listed in the DOT, the mere fact that a knitting machine is involved in the job does not necessarily mean it is fast-paced.  Again, the DOT contains no description of the pace at which the knitting machine works or how the worker interacts with it, apart from a general description of job duties ("Loops stitches of ribbed garments on points of *transfer bar* to facilitate transfer of garment part to needles of knotting machine.  Cuts several stitches by hand to unravel rows of surplus fabric between points and edge of fabric.  May assist KNITTER, FULL-FASHIONED GARMENT to doff machine").  Could this be a fast-paced job?  Perhaps.  But it is the Plaintiff's burden to demonstrate an actual conflict here, and the Court finds, taking all of the evidence into account, Plaintiff has not shown a reversible error.  Thus, while it would certainly have been better for the ALJ to ask the pertinent question to Ms. Bradford while she was testifying, the failure to do so here did not materially influence the outcome of the case and is therefore harmless error.

## VII.  <u>Recommended Decision</u>

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner.

## VIII.  <u>Procedure on Objections</u>

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection

-8-

is made, together with supporting authority for the objection(s).
A judge of this Court shall make a <u>de novo</u> determination of those
portions  of the report or specified proposed findings or
recommendations to which objection is made.  Upon proper
objections, a judge of this Court may accept, reject, or modify,
in whole or in part, the findings or recommendations made herein,
may receive further evidence or may recommit this matter to the
magistrate judge with instructions.  28 U.S.C. §636(b)(1).

    The parties are specifically advised that failure to
object to the Report and Recommendation will result in a
waiver of the right to have the district judge review the
Report and Recommendation <u>de novo</u>, and also operates as a
waiver of the right to appeal the decision of the District
Court adopting the Report and Recommendation.  <u>See Thomas v.
Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d
947 (6th Cir. 1981).

                                         /s/ Terence P. Kemp
                                         United States Magistrate Judge